\*\*E-Filed 2/28/06\*\*

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CHARLES NEERDAELS,<br><br>                Plaintiff,<br><br>      v.<br><br>GROUP SHORT TERM DISABILITY AND LONG TERM DISABILITY PLAN FOR EMPLOYEES OF AKAMAI TECHNOLOGIES, INC.,<br><br>                Defendant. | Case Number C 04-00721 JF<br><br>ORDER[1] (1) DENYING AS MOOT THE PLAN'S MOTION TO RECONSIDER, (2) GRANTING THE PLAN'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING NEERDAELS'S MOTION FOR SUMMARY JUDGMENT<br><br>[Docket No. 60, 64, 72] |

      Plaintiff Charles Neerdaels ("Neerdaels") moves for summary judgment to determine that, at the relevant time, his disability made him eligible to receive long-term disability benefits from Defendant Group Short Term Disability and Long Term Disability Plan for Employees of Akamai Technologies, Inc. ("the Plan"). Defendant moves for summary judgment to determine that Neerdaels is not eligible to receive long-term disability benefits. Both motions are opposed. The Court heard oral argument on February 17, 2006.

---

    [1] This disposition is not designated for publication and may not be cited.

Case No. C 04-00721 JF
ORDER (1) DENYING AS MOOT THE PLAN'S MOTION FOR RECONSIDERATION, (2) GRANTING THE PLAN'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING NEERDAELS'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

In addition, the Plan filed a motion for reconsideration of the Court's November 10, 2004 order, in which the Court held that it would review the Plan's denial of Neerdaels's claim for long-term disability benefits *de novo*. The Plan argued that, in *Abatie v. Alta Health & Life Insurance Company*, 421 F.3d 1053 (9th Cir. 2005), the Ninth Circuit overruled earlier case law cited by the Court as establishing a conflict of interest. However, as the parties noted at oral argument, the Ninth Circuit recently decided to rehear *Abatie en banc*. *Abatie v. Alta Health & Life Ins. Co.*, 2006 WL 317032 (9th Cir. Feb 06, 2006). Accordingly, the Court will deny the Plan's motion for reconsideration as moot and review the Plan's denial of Neerdaels's claim *de novo*.

## I. BACKGROUND

This case arises out of Neerdaels's claim that the Plan improperly denied him long-term disability benefits to which he was entitled under the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. §§ 1001 *et seq*.

Neerdaels, who has multiple sclerosis ("MS"), was hired by Akamai Technologies, Inc., ("Akamai") in September 1999 as its director of engineering. On December 19, 2001, he took a leave of absence from work due to complications related to his MS. He received short-term disability benefits from December 27, 2001 through March 5, 2002. On March 6, 2002, with authorization from his doctor, Peter Cassini, Neerdaels returned to work.[2] However, less than two months later, on April 23, 2002, he tendered his resignation to Akamai, effective May 6, 2002.

In March 2003, Neerdaels submitted to the Plan an application for long-term disability benefits. The Plan is administered and insured by Hartford Life and Accident Insurance Company ("Hartford"). On March 31, 2003, Hartford denied Neerdaels's claim, concluding that he no longer was covered by the Plan, because he ceased to be an "Active Full-time Employee" when

---

[2] Neerdaels explains that he returned to work because he could not accept labeling himself as disabled. *See, e.g.*, AR0292.

2

Case No. C 04-00721 JF
ORDER (1) DENYING AS MOOT THE PLAN'S MOTION FOR RECONSIDERATION, (2) GRANTING THE PLAN'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING NEERDAELS'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

he terminated his employment with Akamai on May 6, 2002. *See* AR0051-53. On September 23, 2003, Neerdaels appealed the denial of long-term disability benefits, claiming that Hartford had made an error in its conclusion that he was not eligible. *See* AR0152-60. Hartford obtained an independent record review of Neerdaels's file from Dr. Brian Mercer, who concluded, among other things, that "[f]rom 12/21/01 through 3/5/02 [Neerdaels] would not have been capable of functioning at a full-time sedentary level since he had well-documented exacerbations with sensory loss in the lower extremities," but that "[t]he medical record provided do [sic] not provide objective information that would support Mr. Neerdaels' inability to function at a full-time sedentary capacity from 5/4/02 through 8/27/02." AR0082-83.

On December 9, 2003, Hartford informed Neerdaels of its determination that its original decision to deny his claim for long-term disability benefits was appropriate and would stand. It agreed that Neerdaels was disabled for the period of December 21, 2001, through March 5, 2002, but found no medical evidence to support his claim that he was disabled at the time he resigned. Therefore, Hartford concluded that Neerdaels was not covered under the Plan at the time of his resignation, as he no longer was in an eligible class of employees. This determination represented Hartford's final decision on Neerdaels's claim. *See* AR0071-75. Neerdaels filed the instant action on February 20, 2004.

As is discussed below, in order for Neerdaels to establish that he is eligible to receive long-term disability benefits from the Plan, he must show that he was disabled during the period from May 6, 2002, the effective date of his resignation, through the 90-day elimination period, which ended on August 4, 2002. The following evidence is relevant to the determination of whether Neerdaels can prove that he was disabled during this period.

On March 6, 2002, Dr. Cassini wrote a letter authorizing Neerdaels to return to work following his leave of absence due to complications related to his MS, which began in December 2001. *See* AR0286. On March 25, 2002, Dr. Cassini made the following notes regarding Neerdaels's condition:

> Mr. Neerdaels' lower extremity numbness and paresthesias have almost

3

> completely resolved. It is now confined to a saddle distribution and tips of his toes. Strength has improved. He is experiencing some tremor on Wellbutrin-SR 150. He is now taking this pill once every 2-3 days. Amantadine is effective early in the morning for fatigue. He continues to use Ambien on an as needed basis each night. He returned to work March 6th. He continues to struggle with some mild depression. He believes he has bounced back physically and his lower extremity function is near normal. We discussed switching from Avonex to Rebif. Because of severe side effects on Avonex despite actually being on a higher dose of medication with Rebif Mr. Neerdaels will not be changing his therapy.

AR0285. On April 23, 2002, Neerdaels tendered his resignation, effective May 6, 2002, and his termination was characterized as a "voluntary" end of employment on an Akamai form. *See* AR0332. An April 23, 2002 e-mail message from Paul Sagan stated that Neerdaels had told him that he would "take a few weeks off [following his resignation] and then begin a search." AR0333.

On June 17, 2002, over a month after Neerdaels resigned, Dr. Cassini made the following notes regarding Neerdaels's condition:

> Mr. Neerdaels continues to meet a group up at UCSF. He is interested in the multi-center study to determine the safety and efficacy of Natalizumab when added to Avonex.
>
> The patient's symptoms have been stable. He recently rode his mountain bike up the West side of the Santa Cruz Mountains near Aptos. He has done quite well since using clips. This decreased his need for coordination and he can rely more on lower extremity strength. Mr. Neerdaels quite [sic] his job and is spending a great deal of time with [his] 3-1/2 and 1-1/2 year old children. He comes to the valley twice a week to do some consulting.
>
> Mr. Neerdaels has experienced a slight increase in his depression. He believes this is related primarily to difficulties within the marriage.

AR0284.

On June 20, 2002, Dr. Pelletier, Neerdaels's physician for a study related to MS at the University of California San Francisco, made the following statements about Neerdaels's condition:

> He is a 36 y-o right-handed male patient who was diagnosed with MS in December of 1998 after his second attack of numbness. His initial symptoms occurred on July 4th 1998 when he acutely experienced pins and needles from his knees bilaterally down to his feet. It lasted about 1 month and went away completely without medication. Six months later he experienced a second episode

4

Case No. C 04-00721 JF
ORDER (1) DENYING AS MOOT THE PLAN'S MOTION FOR RECONSIDERATION, (2) GRANTING THE PLAN'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING NEERDAELS'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

> in December of 1998, he had some difficulty walking, didn't feel his feet touching the ground, leg numbness and a Lhermitte's sign. He received Neurology attention, brain MRI showed 3-4 lesions. A diagnosis of MS was given at that time. He initiated Avonex therapy in February 1999. Since then he's been having sensory attacks once to twice a year despite the use of Avonex. His last well-documented attack was in December of 2001 when he went numb from his upper thorax down his feet involving his arms. . . . He his [sic] now left with some residual sensory deficits and difficulty running and playing soccer. He has several mild pseudo-attacks lasting few days that he attributes to his young children constantly having respiratory infections. He denies having progressive deficits between attacks. He has some urinary hesitancy and no current infections.
>
> . . . He denies depressive symptoms. . . .
>
> His physical exam today is essentially normal . . . . His overall EDSS is 2.0 today

AR0255.

On September 23, 2003, for the purpose of Neerdaels's appeal, Dr. Cassini wrote a letter describing Neerdaels's physical condition, in which he described the history of Neerdaels's condition:

> Mr. Neerdaels has been under my care since January 2000. He presented at that time with two episodes of paresthesias, pain and dysmetria affecting the lower extremities. The first episode occurred in July 1999. Although both spells severely limited Mr. Neerdaels' ability to walk safely they did resolve to the point that he returned to work. Mr. Neerdaels was worked up and found to have multiple sclerosis. He has had numerous relapses over the last few years despite being on immuno-modulating therapy. . . .
>
> Over the years Mr. Neerdaels' neurologic deficits have slowly increased. Due to the nature of his disease his physical limitations were only worsened over time. . . .

AR0130.

On November 26, 2003, Dr. Mercer wrote a letter to Dr. Cassini, summarizing and verifying a conversation between the two doctors:

> I specifically asked you regarding his functional capabilities during the late spring and summer of 2002. We discussed your medical record entry of June of 2002, in which you noted he was able to ride a mountain bike. You indicated that he could ride a bike better than walking, since this eliminates the need for sensory deficit input from his feet that is necessary to maintain balance while standing. You feel that he had a good balance of his trunk and upper body allowing him to ride a bicycle. However, at that time, you felt that his gait was significantly impaired. I also asked you about the indication that he was consulting two times per week; and how this might be interpreted from the cognitive perspective. I was wondering that if he truly had a fixed cognitive deficit how he might be able to

5

> consult two times per week. You reiterated that you feel he had impaired insight and had made inappropriate choices including during that time period. In March of 2002, you noted that he did have fine tremor and was taking Amantadine due to poor energy and had ongoing saddle numbness. However, we did discuss that a return to work on 3/6/02. You described that you felt that he was trying to achieve more than he was actually capable of doing, but you did not want to stand in his way of trying to do this. In your opinion, you felt that he was disabled at that point. Mr. Neerdaels saw himself as a young healthy individual, although suffering from multiple sclerosis, who was the provider for his family, which would required [sic] him to work, and therefore, he did everything he could to try to return to work. I asked you if you were aware of any details of events that occurred during March through June, which led him ultimately to leave work. You indicated that you were unaware of this and did not record it in the medical record.
>
> I asked your opinion about Mr. Neerdaels' work capability. You feel that since 2001, including through the rime that he worked in 2002 and onward, that he was totally disabled from full-time sedentary employment. You feel this is based upon his frequent intermittent exacerbations of multiple sclerosis causing focal neurologic deficits, his cognitive difficulties, and fatigue. Although he did work from March through June of 2002, you felt that this was a special attempt by Mr. Neerdaels to try to continue to work when it was not clearly advisable or likely to succeed. You noted that he may have a few good days intermittently, he has had no sustained level of food functionality that would allow him to work on an ongoing basis.

AR0085-86. In reviewing Neerdaels's record, Dr. Mercer concluded:

> The medical record provided do not provide objective information that would support Mr. Neerdaels' inability to function at a full-time sedentary capacity from 5/4/02 through 8/27/02. As noted previously, he had significant improvement of functionality during this time, was able to ride mountain bike, and was doing some part-time consulting work.
>
> Dr. Cassini indicates that he believes that Mr. Neerdael has had cognitive deficits for a prolonged period of time. However, the medical records do not contain mental status examinations that document cognitive abnormalities to substantiate restrictions or limitations from the cognitive perspective. There is simply no objective data in the records to delineate any need for cognitive restrictions. The ability to do consulting work two times per week in the late spring of 2002 would be inconsistent with a fixed cognitive deficit requiring significant cognitive restrictions or limitations at that time.

AR0084. Dr. Mercer stated that "from approximately 3/6/02 through 8/27/02, [Neerdaels] would have been capable of functioning at a full-time sedentary capacity." AR0083.

## II. LEGAL STANDARD

Under the *de novo* standard of review, this Court "must review *de novo* the plan

6

Case No. C 04-00721 JF
ORDER (1) DENYING AS MOOT THE PLAN'S MOTION FOR RECONSIDERATION, (2) GRANTING THE PLAN'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING NEERDAELS'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

administrator's decision to deny benefits." *Parra v. Life Ins. Co. of North America*, 258 F. Supp. 2d 1058, 1064 (N.D. Cal., 2003). Unless "there are genuine issues of material fact in dispute," the Court "may decide the case by summary judgment." *Id*. The burdens of proof under the *de novo* standard of review are: "Plaintiff must carry the burden to prove that she was disabled under the meaning of the plan and Defendants must carry the burden of proving the applicability of any plan coverage exclusion they seek to invoke." *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal., 2003).

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the Court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets this initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. A genuine issue for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Anderson*, 477 U.S. 242, 248-49; *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991).

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. *Id*.

7

Case No. C 04-00721 JF
ORDER (1) DENYING AS MOOT THE PLAN'S MOTION FOR RECONSIDERATION, (2) GRANTING THE PLAN'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING NEERDAELS'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

### III. DISCUSSION

In order to establish that he is eligible to receive long-term disability benefits from the Plan, Neerdaels must prove that he was disabled under the terms of the Plan. The Plan's insurance policy provides that benefits become payable if (1) the claimant becomes "Disabled" while insured under the plan, (2) the claimant remains "Disabled" throughout the "Elimination Period," (3) the claimant remains "Disabled" beyond the "Elimination Period," (4) the claimant is and has been during the "Elimination Period" under the "Regular Care of a Physician," and (5) the claimant submits "Proof of Loss" satisfactory to Hartford. POL028. The policy further provides that coverage terminates on the earliest of a number of specified dates, including the date the claimant ceases to be an "Active Full-time Employee."[3] POL034. If the insurance terminates because the claimant's employment terminates, then coverage is continued automatically for thirty-one days after the termination. *Id*. However, if the claimant's employment terminates (i.e., he ceases to be an "Active Full-time Employee") because he is "Disabled," his coverage is continued both during the "Elimination Period" while he remains "Disabled" by the same "Disability" and after the "Elimination Period" for as long as he is entitled to benefits under the policy. POL035.

"Disabled" means that the claimant is prevented by sickness or another specified condition from performing one or more of the "Essential Duties" of his occupation and, as a result, his "Current Monthly Earnings" are no more than 80% of his "Indexed Pre-disability Earnings." POL038. An "Essential Duty" is a duty that is "substantial, not incidental," is "fundamental or inherent to the occupation," and cannot be "reasonably omitted or changed." POL039. Being at work for the number of hours in the claimant's regularly scheduled workweek is an "Essential Duty." *Id*. The "Elimination Period" is the period of time the claimant must be "Disabled" before benefits become payable. For the purposes of this case, it is the first ninety

---

[3] An "Active Full-time Employee" is an employee who works for the employer on a "regular basis in the usual course of the Employer's business. The employee must work the number of hours in the Employer's normal work week.." POL038.

8

Case No. C 04-00721 JF
ORDER (1) DENYING AS MOOT THE PLAN'S MOTION FOR RECONSIDERATION, (2) GRANTING THE PLAN'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING NEERDAELS'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

consecutive days of any one period of "Disability." POL026. Under the policy, "Any day that [claimant was] Actively at Work will not count towards the Elimination Period." POL029.

The Plan argues that Neerdaels must establish that he was disabled as of May 6, 2002, the effective date of his resignation, and for the following ninety-day period. In some of his papers, Neerdaels appears to argue that he may establish eligibility for benefits by showing that he was disabled for the period beginning on December 19, 2001, when he took a leave of absence from work due to complications related to his MS. However, elsewhere, he appears to concede that he must establish his disability for the period beginning on May 6, 2002. The Court agrees with the Plan that the relevant period begins on May 6, 2002. Neerdaels's leave of absence beginning on December 19, 2001 does not satisfy the Elimination Period requirement because he returned to work full-time, with full pay, beginning on March 6, 2002, fewer than ninety days after his leave began.

Neerdaels argues that Dr. Mercer's conclusion that Neerdaels was not disabled during the relevant period is incorrect because Dr. Mercer was not provided with a definition of Neerdaels's occupation. Neerdaels describes his position as the Vice President of Strategic Planning as requiring 50 to 70 hours of work per week and an enormously high level of cognition. While it appears from the record that Dr. Mercer neither discussed the precise requirements of Neerdaels's position nor evaluated expressly Neerdaels's disability with reference to these specific requirements, the Court concludes that these failures are not determinative. Because Dr. Mercer found that there was "no objective data in the records to delineate *any* need for cognitive restrictions," his medical conclusions would not have led to a finding of disability even if he had considered Neerdaels's specific job requirements. AR0084 (emphasis added).

Neerdaels also argues that, while Dr. Cassini noted on June 17, 2002 that Neerdaels was doing consulting twice a week, "the evidence shows that consulting work consisted of a total of seven hours spread over two weeks in January and February of 2003." While the administrative record includes a consulting statement for only seven hours of consulting, this evidence is not conclusive proof that Neerdaels did not do any additional consulting, as was indicated by Dr.

9

Cassini. AR0204. Moreover, the Court's conclusion that there is not enough evidence to establish that Neerdaels was disabled at the time he quit does not turn on the evidence, or lack thereof, of Neerdaels's consulting work. Instead, the Court bases its conclusion on the fact that there is insufficient evidence of medical reports made during the relevant time period that would establish that Neerdaels was disabled, in part as a result of cognitive defects.

Neerdaels directs the Court's attention to a number medical opinions relating to his disability, which, if they had been given during the relevant time period about the relevant time period, might provide a triable issue of fact or lead the Court to find that Neerdaels was disabled at the time he quit his job. However, the evidence to which Neerdaels cites does not rise to this level. For example, while Dr. Cassini found that Neerdaels had "weakness/numbness in lower extremities. impaired dexterity all 4 extremities," this conclusion was made in March 2003, seven months after the end of the relevant ninety-day period. AR0305. Dr. Cassini also told Dr. Mercer that he believed that "since 2001, including through the time that [Neerdaels] worked in 2002 and onward, that he was totally disabled from full-time sedentary employment." AR0086. Even these statements about Neerdaels's disability are not conclusive evidence of his disability at the time he quit his job because they were made in November, 2003.

The contemporaneous evidence in the record of Neerdaels's physical condition during the relevant ninety-day period does not support a conclusion that Neerdaels was disabled at the time he quit his job. On June 17, 2002, Dr. Cassini noted that "[Neerdaels's] symptoms have been stable. He recently rode his mountain bike up the West side of the Santa Cruz Mountains near Aptos. He has done quite well since using clips. This decreased his need for coordination and he can rely more on lower extremity strength. Mr. Neerdaels quite [sic] his job and is spending a great deal of time with [his] 3-1/2 and 1-1/2 year old children. He comes to the valley twice a week to do some consulting." AR0284. When Dr. Pelletier examined Neerdaels on June 20, 2002, he noted that Neerdaels was then "left with some residual sensory deficits and difficulty running and playing soccer. He has several mild pseudo-attacks lasting few days that he attributes to his young children constantly having respiratory infections. He denies having

10

Case No. C 04-00721 JF
ORDER (1) DENYING AS MOOT THE PLAN'S MOTION FOR RECONSIDERATION, (2) GRANTING THE PLAN'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING NEERDAELS'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

progressive deficits between attacks.  He has some urinary hesitancy and no current infections. . . . He denies depressive symptoms. . . .  His physical exam today is essentially normal." AR0255.

Accordingly, having concluded that the evidence in the record does not establish that Neerdaels was disabled during the relevant ninety-day period, the Court will deny Neerdaels's motion for summary judgment and grant the Plan's motion for summary judgment.

### IV. ORDER

Good cause therefore appearing, IT IS HEREBY ORDERED that the Plan's motion for reconsideration is DENIED as moot.

IT IS FURTHER ORDERED that the Plan's motion for summary judgment is GRANTED, and that Neerdaels's motion for summary judgment is DENIED.

DATED: February 28, 2006

_____
JEREMY FOGEL
United States District Judge

11

Case No. C 04-00721 JF
ORDER (1) DENYING AS MOOT THE PLAN'S MOTION FOR RECONSIDERATION, (2) GRANTING THE PLAN'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING NEERDAELS'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

1  This Order has been served upon the following persons:

2  Thornton Davidson          rosatilaw@aol.com, jjills2@hotmail.com, jll_flks@yahoo.com

3  Michelle Yumi McIsaac      michelle.mcisaac@sdma.com, dennis.rolstad@sdma.com

4  Dennis G. Rolstad          dennis.rolstad@sdma.com

5  Robert J. Rosati           rosatilaw@aol.com, jjills2@hotmail.com, jll_flks@yahoo.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12

Case No. C 04-00721 JF
ORDER (1) DENYING AS MOOT THE PLAN'S MOTION FOR RECONSIDERATION, (2) GRANTING THE
PLAN'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING NEERDAELS'S MOTION FOR SUMMARY
JUDGMENT
(JFLC1)